## BROWN v. UNITED STATES.

District Court, E. D. Illinois.

June 4, 1941.

Samuel V. Jinkins, of Danville, Ill., for plaintiff.

William Lytle, Sp. Agent, War Risk Insurance Dept., of Chicago, Ill., and Ernest McHale, Asst. U. S. Atty., of East St. Louis, Ill., for defendant.

LINDLEY, District Judge.

Plaintiff sues upon a war risk insurance policy. He previously recovered judgment in 1931, upon the finding that he was totally and permanently disabled, a condition persisting from the date of his discharge from the army.. The Government paid the installments accruing upon the policy in pursuance of the judgment up to and including July 19, 1938, when it ceased payment, the Administrator at that time deciding that plaintiff was not totally and permanently disabled. Thereafter, following a disagreement, this suit was filed.

Under Countee v. United States, 7 Cir., 112 F.2d 447, the previous judgment was a final adjudication as between the parties that the disabled person was totally and permanently disabled. However, it was not an adjudication that the condition would, at all times in the future, constitute total and permanent disability. It follows, therefore, that the Government is not precluded from obtaining a subsequent adjudication that total and permanent disability has ceased. It may not relitigate the questions originally adjudicated but it may show "a change in the physical condition and must overcome the presumption of total and permanent disability as previously judicially determined." Following this decision, as a result of pre-trial conference, I ruled that the Government might show that plaintiff is not now and was not at the time the Government ceased payment suffering from a total and permanent disability from any one or more of the causes set up in the original declaration.

In pursuance of this ruling the Government assumed the burden. It made no attempt to relitigate the question orig-

---

[15] For reasons see the certificate of the Referee dated April 17, 1940, filed April 19, 1940.

inally decided but sought to show by testimony that since the judgment was entered plaintiff had so far recovered as not to be totally and permanently disabled now or when the insurance payments ceased.

On March 28, 1934, plaintiff entered the Veterans Facility Hospital at Hines, Illinois. He remained there until the 17th day of April and was examined by different members of the staff, resulting in a final Board diagnosis as follows: mild chronic tonsillitis, moderate obesity, moderately severe left varicocele; moderate internal hemorrhoids, moderate weak feet, mild chronic bronchitis, mild bilateral chronic catarrhal otitis media, partial bilateral mild deafness, compound bilateral hyperopic astigmatism, moderate right amblyopia, presbyopia and constitutional psychopathic inferiority without psychosis.

In 1932 a Board at the same institution had made a diagnosis of mild chronic lumbar myalgia, essential hypertension, moderate obesity. The same Board in March, 1937, had admitted plaintiff to the hospital for treatment for renal calculus. He was discharged April 1, 1937, with the diagnosis that no stone was found and that he was suffering from mild bronchitis. Apparently there was no examination of plaintiff at that time except a general examination and a special urinalysis, resulting in the diagnosis mentioned.

As a result of a period of observation lasting from April 11, 1938, to May 3, 1938, the Board at the Veterans Facility at Hines made a diagnosis of psychoneurosis, hypochondriacal type, moderate; severe obesity; chronic osteoarthritis, hypertrophic, in lower dorsal spine; moderate, mild bilateral weak feet. The neurologist found no psychosis but commented that he had reviewed the Regional Report folder and found that the patient had carried many different diagnoses and that as he looked over the folder with all these diagnoses given the patient "it seems miraculous that he is alive today," but that at the Facility no physical disease was found. A similar period of study and observation lasting from October 4, 1939, to October 29, 1939, resulted in a diagnosis of severe obesity; chronic hypertrophic osteoarthritis of the lower dorsal spine, moderate; psychoneurosis, hypochondriacal anxiety type, moderate; mild bilateral weak foot. Plaintiff spent a similar period at the same Facility January 17, 1941, to February 14, 1941, resulting in a diagnosis of psychopathic personality, psychoneurosis, hypochondriacal type with good tolerance; hemorrhoids, internal and external; moderate, osteoarthritis, chronic, hypertrophic, lower dorsal spine; left elbow, mild; mild bilateral weak foot; cholecystitis and probably cholelithiasis, functional cathartic colitis, not organic; severe obesity.

Some of the physicians participating in these examinations testified. They found, in addition to what has been mentioned, a deviated septum in the nose, an abnormal obesity due, as one of them said, to over eating, possible gall-bladder inflammation, a nervous tendency toward hysteria, a neurosis as to his heart, believing, however, that the nervousness was not due to physical defects. They found arthritis in the eleventh and twelfth vertebrae, mild chronic colitis, mild gall-bladder inflammation, a spastic colon, a mild abnormal heart condition and believed that he intentionally exaggerated his distress and abnormal conditions. One neurological expert was not sure that plaintiff could control this exaggeration and hesitated to deny that his obsession of inability to work was so fixed that in view of his mental condition it could not be removed. He found no disease of the central nervous system but pychoneurosis of hypochondriac character with inclination toward hysteria. This doctor, when asked if plaintiff was conscious of exaggeration of his symptoms, said that he had a feeling that plaintiff, as a child, demanded the utmost attention. He was honestly and sincerely attempting to aid the court in the solution of the problem confronting it, and yet he had to confess that the medical profession could throw little light upon the question of whether one who is obsessed with permanently fixed ideas is totally and permanently disabled.

I have not attempted to state all of the testimony or set out the contents of the written reports in detail. The exhibits appear in evidence and afford ready reference.

Plaintiff's testimony in his own behalf is that he experienced a slight paralytic stroke January 30, 1940, to the extent that it impaired use of his left side; that he was taken to the Veterans Facility hospital in Danville in an ambulance, stayed there part of one day, returned home and went to the Facility a week later for examination. He testified that since 1938 he has experienced constant stomach trouble, pains around his heart, chronic bronchitis,

kidney trouble and pains in his chest and legs. He said that the pains were "like a knife cutting"; that the bones in the legs felt "like they were crumbling"; that his muscles swell; that pains come and go; that he wheezes, is short of breath, coughs and expectorates a sputum which is black, yellow and bloody; that at times he is unable to walk at all; that he occasionally walks without a cane but customarily uses one; that he gets no exercise except walking and is soon tired out trying to walk; that he eats sparingly and tries to reduce but still gains in weight; that his left side is slightly paralyzed, compelling him to drag his left foot; that he uses hot cloths to relieve swelling in his legs and that he has varicose veins.

In August, 1940, while in the County Court House, he started to fall, as result of a seizure. Two men caught him, and after he had recovered in one of the offices in the Court House, he went home on a bus. He testifies that he had a similar seizure in front of one of the banks, got to an adjoining tavern, sat on a chair and there rested; that he has had several such seizures at his home during the period of from 1938 to 1941; that he almost "passed out" in February, 1941; that his only warning of an attack is nausea and dizziness; that during a seizure he becomes very weak; that an attack lasts about an hour; that the only work he has done is selling balloons occasionally on the public square.

Various lay witnesses corroborate him to a greater or less degree. One had seen him at the time of the seizure in the Court House; another had seen him ill at home and lived so near him that he could hear plaintiff coughing and wheezing at night; and still another testified that when he has his "fainting spells" those about him have to catch him to prevent him from falling and that she had seen him lose consciousness, had observed his coughing spells and asthma and had seen him in bed frequently.

Dr. Curtis examined plaintiff on August 16, 1937, treated him and observed him, again later in August, twice in February, 1938, May 24, 1938, June 20, 1938, June 29, 1938, August 7 and 20, 1938, January 9, 1937, October 8, 1938 and July, 1940. In an examination in August, 1937, he made a diagnosis of arrested pulmonary tuberculosis, chronic bronchitis with asthma, hypertensive heart disease with cardiac hypertrophy and beginning myocardial failure, left kidney stone, with blood and pus in urine, partial blindness of right eye, flat feet, hemorrhoids, severe obesity, tremor and sacro-iliac arthritis. In the course of the other observations he found pain over the left kidney, a respiratory affection, a high complication of dizziness and faintness, myocardiac degeneration, pains across the chest and nervousness. He was of the opinion, from his examination, observation and treatment, that plaintiff was unable to perform any kind of physical labor. At the request of the Veterans Administration he reported on February 28, 1934, that plaintiff had periodic attacks of asthmatic bronchitis, pains in the left sacro-iliac joint, cardiac enlargement, heavy trace of sugar in urine, chronic myocarditis, diabetes mellitus, low sugar tolerance, chronic bronchitis, possible left kidney stone and "incapacitation." Dr. Curtis again on October 13, 1938 reported to the Veterans Administration an examination to the same effect; in June, 1936, dizziness, headache, hypertension asthmatic bronchitis, due to upper respiratory infection or old bronchiectosis and on July 9, 1940, sacro-iliac arthritis, varicose veins, flat feet, chronic bronchitis, myocardial degeneration; on July 5, 1940, coughing, shortness of breath, sacro-iliac pain and stiffness, with diagnosis of bronchitis, myocarditis, varicosis in legs, sacro-iliac arthritis.

Dr. Andrews examined plaintiff October 19, 1938 and reported to the Veterans Administration the result, including diagnosis of chronic myocardiac degeneration, diabetes, hypertension, chronic sacro-iliac arthritis, chronic bronchitis. He again reported to the Administration on May 9, 1940, that he found heavy mucous rales throughout the chest and bronchitis with asthma and hypertension.

Dr. Dawson, a neuropsychiatric expert as well as practicing physician, made a complete examination on May 15, 1941. He found severe myocardial degeneration with moderately severe sacro-iliac arthritis, moderately severe chronic bronchitis, varicose veins in both legs, moderately severe chronic prostatitis, second degree flat feet moderately severe, bilateral, with resulting foot weakness. He was of the opinion that plaintiff was suffering from psychoneurosis, anxiety type. He believed that this nervous condition was not due to organic infection but was of the character found in

the ordinary neurotic condition with tendency toward hysteria. Plaintiff's obsessions he believed are irremovable.

It is probably true that no one of the physical ailments from which plaintiff suffers would totally and permanently disable him, but when we consider the inevitable momentum of his physical troubles and the accumulated effect thereof, it seems clear to me that this man is physically permanently and totally disabled. In addition, however, and coupled with this we have a psychoneurosis which, when all is said and done, is of that intangible character which the medical profession, with all of its brilliant achievements can tell us little about. Such a psychoneurosis arises not from pathological sources but from something in the mind of man. There is no such thing as medical cure or treatment. The only hope of improvement lies in an environment created by companions of such experience and such knowledge as know best how to help the patient. Fixed ideas and fixed obsessions which doctors can not remove may incapacitate a man as completely as physical injury or organic infection, and the profession finds itself unable to suggest a remedy. If a man is so obsessed with the idea that he is incapacitated that his conviction can not be removed, it is obvious that he can not carry on labor either under his own direction or for others. I believe the Administrator fell into the error that no examiner found any one particular thing that would incapacitate plaintiff and the further error of not considering the accumulated momentum of all his ailments or the effect of psychoneurosis upon a man attempting to work. I believe the fair conclusion from all of the evidence is that this man is now and has been since 1938 totally and permanently disabled within the meaning of those words as used in the Acts of Congress and that the burden imposed upon the Government to prove that the condition heretofore found to constitute total and permanent disability has so improved as to lack the qualities of such disability has not been sustained. Under Judge Treanor's opinion in Countee v. United States, supra [112 F.2d 450], it may not be necessary to go as far as I have but merely to suggest that the record contains no evidence which could be construed as tending to show that plaintiff's condition has changed or in any respect differed from what it was at the trial of the previous suit. In his words "the record contains no evidence from which the jury could have found that plaintiff's * * * condition, which had been adjudicated to constitute total and permanent disability, had so changed that plaintiff had ceased to be totally and permanently disabled."

I adopt the foregoing as my findings of fact and conclusions of law. Proper judgment may be submitted.